The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: July 30, 2026

**NO. S-1-SC-40478**

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**ALEXEE J. TREVIZO,**

Defendant-Appellee.

**INTERLOCUTORY APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler Gray, District Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Michael J. Thomas, Assistant Solicitor General
Albuquerque, NM

for Appellant

Gary C. Mitchell, PC
Gary C. Mitchell
Ruidoso, NM

Law Office of Amber Fayerberg
Amber Fayerberg
Ngunguru, New Zealand

Pregnancy Justice
Kulsoom Ijaz
Karen Thompson
New York, NY

for Appellee

The Law Office of Ryan J. Villa
Katherine Loewe
Richelle Anderson
Albuquerque, NM

University of California, Irvine School of Law
Ji Seon Song
Irvine, CA

for Amici Curiae Ji Seon Song, American Civil Liberties Union of New Mexico & National Police Accountability Project

Dodd Law Office, LLC
Christopher A. Dodd
Albuquerque, NM

Lawyers for Good Government
Khadijah Silver
Washington, DC

for Amicus Curiae American College of Obstetricians and Gynecologists

**OPINION**

**VIGIL, Justice.**

{1}     This case requires us to clarify the contours of our physician-patient privilege, set forth in Rule 11-504 NMRA, and waiver of the privilege in light of the need to protect patient autonomy and access to care. For the reasons set forth herein, we conclude that the physician-patient privilege belonging to Defendant Alexee Trevizo was not waived and affirm the order of the district court suppressing all evidence obtained by the State subject to the privilege.

**I.     BACKGROUND**

**A.     Facts**

{2}     Defendant was a nineteen-year-old high school student on the occasion of the incidents leading to charges against her. On January 27, 2023, she went to the Artesia General Hospital Emergency Department (ED) in Artesia, New Mexico, with her mother around midnight seeking treatment for severe lower back pain. She told Dr. Heather M. Vaskas, the ED doctor, and nursing staff that her pain began after cheerleading practice earlier that afternoon. Asked if she was pregnant, Defendant responded she was not, stating she had vaginal bleeding and that she was currently "on her period."

{3}    Triage began at 12:13 a.m., and Defendant "rated her back pain to be 10 out of 10, with 10 being the most severe." At 12:18 a.m., Defendant was given ketorolac ("a non-steroidal anti-inflammatory" drug), acetaminophen ("a pain killer and fever reducer"), ondansetron (a drug to prevent vomiting), and cyclobenzaprine ("a strong muscle relaxant"). Ten minutes later, at 12:28 a.m., Defendant's nurse administered intravenous (IV) fluids of sodium chloride with additional ketorolac, additional ondansetron, an unknown additional amount of cyclobenzaprine, and an unknown amount of morphine. Morphine is "a strong pain killer . . . [that] induces sleep or drowsiness" and is listed as "a Schedule II drug on the schedule of the Controlled Substances Act."[1]

{4}    At 12:28 a.m., Dr. Vaskas ordered a serum pregnancy test, a standard practice for someone of Defendant's age with her symptoms. The serum was collected at 12:30 a.m., and the result showing Defendant was pregnant was reported to Dr. Vaskas and Defendant's nurse at 12:51 a.m. Notwithstanding the positive pregnancy test, Defendant's nurse continued administering the IV medications to Defendant. Defendant continuously received ketorolac, ondansetron, cyclobenzaprine, and

---

[1]*See Controlled Substances Act – Alphabetical Order*, U.S. Drug Enf't Admin. 17 (May 22, 2026), https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf [https://perma.cc/XS34-83YK].

morphine for forty-eight minutes from the time the pregnancy test result was reported to Dr. Vaskas and Defendant's nurse until the IV was disconnected; the amount of medication administered is unknown. The IV was stopped at 1:39 a.m., when Defendant told her nurse she urgently needed to have a bowel movement. The sensation of needing a bowel movement may have been an indication that Defendant's cervix was fully dilated and she was moving into the delivery phase.[2] Nevertheless, Defendant was not informed by any hospital staff that she was pregnant. The nurse disconnected the IV to allow Defendant to use the bathroom, and hospital security camera footage shows Defendant running down the hallway, past the nursing station, clutching her backside.

{5}      Defendant was in the locked bathroom for nineteen minutes. While Defendant was in the bathroom Defendant's mother and nursing staff checked on Defendant but did not enter the bathroom. From 1:53 to 1:56 a.m., Dr. Vaskas and nursing staff again checked on Defendant without entering the bathroom, but they were ready to open and enter the bathroom with a key. Defendant gave birth to a newborn she described as not moving, crying, or breathing.

---

[2]*See* Labor and Delivery, Eunice Kennedy Shriver Nat'l Inst. of Child Health & Hum. Dev. https://www.nichd.nih.gov/health/topics/factsheets/labor-delivery [https://perma.cc/ZW67-QKS7] (last visited June 23, 2026).

{6}     At 1:57 a.m., Defendant exited the bathroom and walked back to her room with Dr. Vaskas. Minutes later, at 2:02 a.m., Dr. Vaskas ordered a transvaginal ultrasound for Defendant because of her profuse vaginal bleeding. At 2:20 a.m., Dr. Vaskas performed a pelvic exam on Defendant for the first time. Despite noting a "significant amount of blood," "multiple extremely large clots," and Defendant's "wide open cervix," Dr. Vaskas did not inform Defendant of her dire emergency condition.

{7}     After being called to clean up blood from the bathroom and hallway, ED cleaning staff found the newborn in a trashcan inside the bathroom at 2:27 a.m. Dr. Vaskas pronounced the newborn dead at 2:28 a.m. Autopsy lab results later showed that the deceased newborn had free morphine in his heart blood.

{8}     Realizing that Defendant was not only vaginally bleeding but had just given birth and could die from a postpartum hemorrhage, Dr. Vaskas contacted Lovelace Regional Medical Center (Lovelace) in Roswell, New Mexico, to arrange an urgent transfer. Dr. Vaskas did not reexamine Defendant or discuss Defendant's condition with her until law enforcement personnel were present as witnesses.

{9}     Law enforcement was notified immediately, and two police officers with the Artesia Police Department arrived at 2:38 a.m. The charge nurse was the first to speak to them and immediately told them Defendant "wouldn't tell us she was

pregnant" and "killed the kid." Dr. Vaskas joined the conversation and told the officers that she had not yet told Defendant "what was going on" or about Defendant's need for an urgent medical transfer. Dr. Vaskas told the officers the gravity of Defendant's medical condition: "So officers, so, first thing, I need to make sure the mother is stable. I don't know if she delivered a placenta, she is bleeding a lot." She asked if "one of [them wanted] to be part of the conversation" and invited the officers into Defendant's room. The officers both proceeded to Defendant's room together with Dr. Vaskas and the charge nurse.

{10} Just after 2:41 a.m., the two uniformed, armed male police officers, the male charge nurse, and Dr. Vaskas entered Defendant's room. Defendant's mother was in the room as her designated caregiver and emergency contact. Dr. Vaskas positioned herself at Defendant's bedside, while the officers and the charge nurse blocked the doorway. Dr. Vaskas immediately confronted Defendant with the statement, "We discovered a dead baby in the bathroom," and Defendant responded, apparently not only to Dr. Vaskas, but also to the police "I'm sorry, it came out of me; I didn't know what to do." Defendant added that she held the baby and there was "'no movement, no breathing, nothing.'" One of the officers wrote in his report that, after making this statement, Defendant was detained, that she was not free to leave, and that he stood

at the doorway to ensure she could not leave. Defendant was officially detained within three minutes after the police officers entered the room.

{11}    Following this confrontation, Dr. Vaskas for the first time told Defendant that she had a medical emergency and asked Defendant's mother for consent to be airlifted to the nearest regional hospital because Defendant "just had a baby and I don't know if [Defendant] delivered the placenta. She's bleeding significantly." The officers remained in Defendant's room even as Defendant received another vaginal examination. Defendant was airlifted to Lovelace almost two hours after Dr. Vaskas determined that she could "die" from postpartum hemorrhage.

**B.    Motion to Suppress**

{12}    Defendant was charged with one count of first-degree murder or, in the alternative, intentional abuse of a child resulting in death, and one count of tampering with evidence. Defendant filed a motion in the district court: (1) to suppress all statements made to her medical providers on the basis that her physician-patient privilege under Rule 11-504 was violated and (2) to suppress all statements she made in the presence of the police officers on the basis that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Following a hearing, the district court entered detailed findings of fact and conclusions of law and, in all respects, granted Defendant's motion.

{13} The district court concluded that (1) Defendant's statements to her healthcare providers are confidential and protected under the physician-patient privilege of Rule 11-504, (2) Defendant did not waive the privilege notwithstanding the presence of the police officers when she responded to Dr. Vaskas's statement that a dead baby was discovered in the bathroom, (3) Defendant did not waive the privilege notwithstanding her mother's presence, and (4) when Dr. Vaskas entered Defendant's room and told Defendant that a dead baby was discovered in the bathroom, Defendant's right to receive *Miranda* warnings was violated.

{14} In its analysis, the district court explained that the statement made by Defendant's own doctor that a dead baby was discovered in the bathroom was made "in a highly confrontational manner" and "by any reasonable interpretation is shocking, confrontational, and designed to elicit a response." Further, the district court explained, by failing to advise Defendant of her right to confidentiality under the physician-patient privilege, by failing to invoke the privilege on her behalf, and by entering Defendant's room only when accompanied by the police, Dr. Vaskas acted as an agent of law enforcement: "[R]efusing, or at the least, failing, to give shocking information to her patient *except* in the presence of law enforcement made Dr. Vaskas an agent of law enforcement." Furthermore, the district court found, Defendant was surrounded by law enforcement officers, Defendant was not free to

leave and was effectively in custody, and Defendant was not given *Miranda* warnings.

{15}   The State appeals directly to this Court. N.M. Const. art. VI, § 2 (stating that appeals in cases imposing a sentence of life imprisonment shall be taken directly to this Court); NMSA 1978, § 39-3-3(B)(2) (1972) (authorizing an appeal to this Court or our Court of Appeals by the state from a decision or order suppressing or excluding evidence); *State v. Smallwood*, 2007-NMSC-005, ¶¶ 6, 10-11, 141 N.M. 178, 152 P.3d 821 (observing that the New Mexico Supreme Court has jurisdiction to hear interlocutory appeals in situations where a defendant may possibly be sentenced to life imprisonment or death).

{16}   On appeal, the State argues (1) that Defendant had no physician-patient privilege because there is an exception to the privilege for reports that doctors are required by law to make to law enforcement, (2) that any privilege was waived by the presence of the police officers and Defendant's mother during Defendant's communications with her doctor, and (3) that there was no *Miranda v*iolation. We reject the State's arguments related to the physician-patient privilege. Because we hold that Defendant's statements were privileged, it is unnecessary for us to address the *Miranda* question.

## II. DISCUSSION

{17} Our review of the law of privileges and waiver is de novo. *Allen v. LeMaster*, 2012-NMSC-001, ¶ 11, 267 P.3d 806 (stating that a trial court's construction of the laws of privileges and waiver is a question of law subject to de novo review); *see Pacheco v. Hudson*, 2018-NMSC-022, ¶ 24, 415 P.3d 505 (stating that whether specific communications are privileged is a mixed question of fact and law subject to de novo review).

{18} The district court ordered suppression of all evidence obtained by the State in violation of the physician-patient privilege. The physician-patient privilege is set forth in Rule 11-504(B) of our Rules of Evidence as follows:

> A patient has a privilege to refuse to disclose, or to prevent any other person from disclosing, a confidential communication made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition, including drug addiction, between the patient and the patient's physician, psychotherapist, or state or nationally licensed mental-health therapist.

The physician-patient privilege applies by its own terms to a "confidential communication," which is defined as a communication "made privately and not intended for further disclosure except to other persons in furtherance of the purpose of the communication." Rule 11-504(A)(5), (B). "The purpose of the privilege is to encourage a patient to make complete disclosures of [their] symptoms and conditions to a physician without fear of publication." *State v. Roper*, 1996-NMCA-

073, ¶ 6, 122 N.M. 126, 921 P.2d 322. This is because "accurate diagnosis and appropriate medical treatment depend on a patient's willingness to disclose embarrassing, and even potentially incriminating, information." *State v. Lucero*, 2023-NMCA-035, ¶ 22, 528 P.3d 762. Thus, the privilege applies to both civil and criminal cases. *Roper*, 1996-NMCA-073, ¶ 6.

{19} Of course, the physician-patient privilege is not absolute. *State v. Gonzales*, 1996-NMCA-026, ¶ 14, 121 N.M. 421, 912 P.2d 297. Physicians are subject to statutory reporting obligations under NMSA 1978, Section 32A-4-3(A) (2021, amended 2025), and the patient can themselves waive the privilege. Rule 11-511 NMRA (stating the holder of a privilege may waive the privilege). Here, the State argues that the privilege does not attach because of the reporting requirements of Section 32A-4-3(A) (2021) or that Defendant waived the privilege by discussing her medical condition with Dr. Vaskas in the presence of the two police officers and in the presence of her mother.

{20} As a preliminary matter, the State does not meaningfully dispute that Defendant presented herself to the emergency room as a patient seeking a diagnosis and treatment from Dr. Vaskas and the ED staff for severe lower back pain and that those facts support a finding that their communications advancing Defendant's care fall within the privilege. Instead, the State's arguments focus on the effect of Section

32A-4-3(A) (2021) and whether Defendant waived her physician-patient privilege when she responded to Dr. Vaskas's question in the presence of third parties. We address the State's arguments in turn.

**A.     Section 32A-4-3(A) (2021) and the Physician-Patient Privilege**

{21}     The State contends Defendant has no physician-patient privilege as a matter of law. Specifically, the State argues that the mandatory reporting requirement of Section 32A-4-3(A) (2021) combined with the mandatory reporting exception for the privilege under Rule 11-504(D)(4) "demonstrate that there was no privilege here."

{22}     The State's argument requires us to construe a statute and a court rule. "We review issues of statutory interpretation de novo. Our primary goal when interpreting statutes is to further legislative intent. Although the first guide to statutory interpretation is the actual wording of the statute, we have recognized that where the meaning of the facial language of a statute is in doubt, the plain language approach may not lead to a correct interpretation of true legislative intent." *State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317 (internal quotation marks and citations omitted). Further: "In interpreting statutory language as well as in much of the other work courts are called on to perform, it is necessary to think thoughts and not words. We have repeatedly cautioned that despite the beguiling simplicity of parsing the

words on the face of a statute, we must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction." *Id.* (internal quotation marks and citations omitted). "We therefore must examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Id.* ¶ 14 (internal quotation marks and citation omitted). In addition, "this case requires us to interpret a provision of the New Mexico Rules of Evidence, a question of law we also review de novo. When construing our procedural rules, we use the same rules of construction applicable to the interpretation of statutes. We begin by examining the plain language of the rule as well as the context in which it was promulgated, including the history of the rule and the object and purpose." *Kipnis v. Jusbasche*, 2017-NMSC-006, ¶¶ 10-11, 388 P.3d 654 (brackets, internal quotation marks, and citations omitted).

{23}  Our analysis commences with the mandatory reporting requirement of Section 32A-4-3(A) (2021). Under the facts of this case, the plain meaning of the statute requires that every licensed physician "who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report *the matter* immediately to . . . a

local enforcement agency." *Id.* (emphasis added).[3] Upon the law enforcement agency's receipt of the report, the statute orders that the law enforcement agency "shall take immediate steps to ensure prompt investigation of the report." Section 32A-4-3(C) (2021).[4]

{24}     The State then refers us to Rule 11-504, which sets forth the physician-patient privilege. Subsections (A), (B), and (C) of Rule 11-504 provide definitions, describe

---

[3]In its entirety, Section 32A-4-3(A) (2021) provides:

> Every person, including a licensed physician; a resident or an intern examining, attending or treating a child; a law enforcement officer; a judge presiding during a proceeding; a registered nurse; a visiting nurse; a school employee; a social worker acting in an official capacity; or a member of the clergy who has information that is not privileged as a matter of law, who knows or has a reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to:
> (1) a local law enforcement agency;
> (2) the department; or
> (3) a tribal law enforcement or social services agency for any Indian child residing in Indian country.

[4]In its entirety Section 32A-4-3(C) (2021) states:

> The recipient of a report under Subsection A of this section shall take immediate steps to ensure prompt investigation of the report. The investigation shall ensure that immediate steps are taken to protect the health or welfare of the alleged abused or neglected child, as well as that of any other child under the same care who may be in danger of abuse or neglect. A local law enforcement officer trained in the investigation of child abuse and neglect is responsible for investigating reports of alleged child abuse or neglect at schools, daycare facilities or child care facilities.

the scope of the physician-patient privilege, and state who may claim the privilege. Subsection (D) of Rule 11-504 in turn is entitled "Exceptions," and Subsection (D)(4) in pertinent part states, "No privilege shall apply for confidential communications concerning *any material* that a physician . . . is required by law to report to a public employee or public agency" (emphasis added). Summarized, the State's argument is that the discovery of the deceased infant triggered a statutory duty for Dr. Vaskas to report the death to law enforcement under Section 32A-4-3(A) (2021), and therefore there is no physician-patient privilege under Rule 11-504(D)(4). For the reasons which follow, we reject the State's argument because it is too broad.

{25}    The district court ruled, "The hospital had an obligation to notify law enforcement that a crime *might* have occurred but is not entitled to abrogate the physician-patient privilege." As we now explain, we agree with the district court. We construe the statute and rule together so that they operate harmoniously. A patient may prevent disclosure of private communications with a physician "made for the purpose of diagnosis or treatment of the patient's . . . condition," Rule 11-504(B), but no privilege applies to communications concerning "any material" the physician "is required by law to report," Rule 11-504(D)(4). Section 32A-4-3(A) (2021) identifies "the matter" which a physician must report to law enforcement as

knowledge or a reasonable suspicion that a child is abused or neglected. Read together, the statute and rule do not create a blanket exception to the physician-patient privilege. Rather, the exception is narrow: the unprotected "material" under Rule 11-504(D)(4) is limited to "the matter" the physician is required to report—knowledge or reasonable suspicion of child abuse or neglect, § 32A-4-3(A) (2021). *See Strauch*, 2015-NMSC-009, ¶ 27 ("'What the [Ohio reporting] statute requires is actually quite minimal: when [mandated reporters] . . . encounter suspected abuse or neglect . . . , they must report it.'" (quoting *State v. Clark*, 2013-Ohio-4731, ¶ 85, 999 N.E.2d 592 (O'Connor, C.J., dissenting), *rev'd*, 576 U.S. 237 (2015))). The purpose of the reporting requirement is to cause a law enforcement investigation to be initiated. Once the report is made, the physician's duty ends, and the law enforcement duty to investigate immediately begins. Outside this narrow exception to report, all confidential communications between the patient and the physician remain privileged; they are not all automatically converted into unprivileged communications. *See People v. Covington*, 19 P.3d 15, 22 (Colo. 2001) (en banc) (stating that Colorado's mandatory reporting statute waived the physician-patient privilege only for the physician's observations of bullet injuries themselves and not for statements made by the patient to the physician).

{26} Accordingly, we hold that once law enforcement was notified that a deceased infant had been found in a bathroom trashcan, Dr. Vaskas and the hospital personnel satisfied their statutory reporting duty. Beyond those facts, Defendant's physician-patient privilege remained intact unless otherwise waived. We therefore turn to the State's remaining waiver arguments.

**B.       Waiver of the Physician-Patient Privilege**

{27} Whether Defendant voluntarily waived her physician-patient privilege by speaking to Dr. Vaskas in the presence of the police officers and her mother presents an issue we review de novo. *Allen*, 2012-NMSC-001, ¶ 11 (stating that a trial court's construction of the law of privileges and waiver are questions of law subject to de novo review). The State's argument urges us to adopt a per se rule that whenever a third person is present who is not necessary for care or treatment while a patient communicates with their doctor, a waiver of confidentiality takes place, regardless of who the person is or of the circumstances. We reject that argument as inconsistent with caselaw and the policy interests underlying the physician-patient privilege.

{28} Rule 11-511 provides for the waiver of the physician-patient privilege as follows: "A person who possesses a privilege against disclosure of a confidential matter or communication waives the privilege if the person voluntarily discloses or consents to disclosure of any significant part of the matter or communication."

Fundamental to waiver under Rule 11-511 is the principle that the waiver must be voluntary.

{29}    Accordingly, our courts have required a finding that an alleged waiver was voluntary in order to be valid. *See Lucero*, 2023-NMCA-035, ¶¶ 24-30. Our Court of Appeals in *Lucero* grappled with the same question before us in this case: "Under what circumstances does the presence of a third party, able to overhear a communication between a physician and a patient, negate the privilege?" *Id.* ¶ 24. The *Lucero* Court emphasized that any analysis of the physician-patient privilege must be anchored in the interests served by the privilege—"protecting a patient's privacy and autonomy in relating highly sensitive, personal matters concerning their physical or mental condition to a medical provider for purposes of diagnosis or treatment." *See id.* ¶¶ 28-30. Through the lens of patient autonomy, *Lucero* seems to conclude that mere awareness that a third party is present is insufficient, on its own, to waive the privilege. *See id*. Rather, *Lucero* also requires a showing of conduct "sufficient to constitute *voluntarily consent to or acquiescence in* the disclosure of [their] communications." *Id.* ¶ 30 (emphasis added). Although *Lucero* does not reference Rule 11-511, the opinion nonetheless imposes the voluntariness requirement articulated in the rule.

{30}     In *Lucero*, the defendant was injured in a single-vehicle rollover crash. 2023-NMCA-035, ¶ 1. The defendant was being treated in an ambulance when a police officer entered the ambulance and overheard the defendant tell an emergency medical technician (EMT) that she had consumed alcohol. *Id.* When the defendant was later charged with driving under the influence of intoxicating liquor or drugs, she contended that Rule 11-504 prohibited a police officer from testifying to the statements made to the EMT and filed a motion to suppress the statements. *Lucero*, 2023-NMCA-035, ¶¶ 3, 9. At the evidentiary hearing, the trial court focused on whether the defendant knew the police officer was in the ambulance when she made the disclosure to the EMT. *Id.* ¶¶ 9-10. The trial court determined that the defendant should have known the police officer was present and therefore denied the motion to suppress. *Id.* ¶ 12. However, the Court of Appeals reversed the trial court and remanded the case to the trial court for factual determinations: whether the defendant actually knew that the police officer was present in the ambulance when she made her statement to the EMT and, if she did, whether her subsequent conduct was sufficient to demonstrate that she *voluntarily* consented to, or acquiesced in the disclosure of her statement to the police officer. *Id.* ¶¶ 29-30.

{31}     In support of the requirement of voluntary conduct, *Lucero* relied upon *In re Termination of Parental Rights of Sherry C. & John M.*, 1991-NMCA-137, ¶ 25,

113 N.M. 201, 824 P.2d 341, "for the proposition that a patient who has actual knowledge that the communication will be disclosed, and *voluntarily* participates in the communication with that knowledge, has consented to or acquiesced in the disclosure of their physician-patient communication." *Lucero*, 2023-NMCA-035, ¶ 29 (emphasis added). *In re Sherry C.* adds yet another layer to voluntariness under Rule 11-511 that was not explored in *Lucero* but is implied in its discussion of voluntary consent: whether the patient had capacity to waive the privilege. *In re Sherry C.*, 1991-NMCA-137, ¶¶ 26-27. There, the Court of Appeals discussed the foundational requirement of capacity when analyzing whether a mother's cognitive impairment "precluded a finding of waiver or consent." *Id.* The Court of Appeals was "reluctant to find that disclosure was voluntary" despite apparent actual knowledge or consent on behalf of the mother or her attorneys that the treating psychiatrists were reporting to the courts. *Id.* ¶¶ 26-28.[5] Although the case did not, ultimately, turn on incapacity, it nonetheless carries the basic principle that capacity is required for voluntary waiver under Rule 11-511.

---

[5]The Court of Appeals declined to conclude the mother lacked capacity as a matter of law, and it ultimately concluded that the mother failed to argue incapacity and, under the required plain error standard in that case, the record did not make incapacity apparent such that it called the result into question. *In re Sherry C.*, 1991-NMCA-137, ¶ 29.

{32}     Based on the foregoing principles, we conclude that for a valid waiver of the physician-patient privilege to occur by the presence of a third party, at least the following requirements must be satisfied[6]: (1) the patient must have actual knowledge of the presence of a third party not essential to the care, (2) the patient must have the mental and physical capacity to waive the privilege, and (3) under the totality of the circumstances, the waiver must be voluntary. Applying this test to the facts before us, we conclude that Defendant did not voluntarily waive her physician-patient privilege.

{33}     Here, there is no question Defendant knew of the presence of both the officers and her mother, so we focus on the second and third factors of this analysis. The facts are disturbing in many respects. Defendant was a nineteen-year-old high school student who went to the emergency room around midnight because she was suffering from severe back pain which she rated at ten out of ten, with ten being the most severe. Asked if she was pregnant, she said she was not, adding she was bleeding and "on her period." Within five minutes after being admitted to the emergency room, Defendant was given pain medications and a powerful muscle relaxant,

---

[6]We recognize that a defendant may have additional defenses to a claim of waiver of a physician-patient privilege based on the circumstances of the case, but as those defenses are not at issue in this matter, we do not discuss them here.

followed ten minutes later by IV fluids adding more of the same pain medication and muscle relaxant, with morphine added to the mix. A pregnancy test was ordered, and twenty-one minutes later, the result that Defendant was pregnant was reported to Dr. Vaskas and Defendant's nurse. For unexplained reasons, Defendant was never told that, notwithstanding her vaginal bleeding, she was pregnant.

{34}    The only medical response to the positive pregnancy test and knowledge that Defendant was bleeding was to continue giving Defendant the IV fluids containing the powerful muscle relaxant and morphine. The IV was later disconnected only because Defendant said she urgently had to have a bowel movement—a possible indication that Defendant's cervix was fully dilated and she was moving into the delivery phase. Defendant was in the locked bathroom for nineteen minutes, and she gave birth to an infant she reported as not moving, crying, or breathing. She placed the infant inside a trashcan in the bathroom and returned to her bed.

{35}    Five minutes after she returned to her bed, Defendant's profuse vaginal bleeding prompted Dr. Vaskas to order a transvaginal ultrasound. Dr. Vaskas then performed a pelvic exam, finding a "significant amount of blood," "multiple extremely large clots," and Defendant's "wide open cervix." Dr. Vaskas did not inform Defendant of these serious, significant findings or advise her of her positive pregnancy test. When the deceased infant was discovered after the pelvic exam, Dr.

Vaskas recognized that Defendant could die from a postpartum hemorrhage. However, Dr. Vaskas decided she was not going to discuss Defendant's life-threatening condition with her at that time. Her reason was that she wanted to wait for law enforcement presence as witnesses.

{36} When the two officers arrived, the charge nurse told them Defendant "wouldn't tell us she was pregnant" and "killed the kid." Dr. Vaskas joined the conversation, telling the officers she had not yet told Defendant "what was going on" or that Defendant needed an urgent medical transfer. Dr. Vaskas told the officers, "So officers, so, first thing, I need to make sure the mother is stable. I don't know if she delivered a placenta, she is bleeding a lot." Incredibly, Dr. Vaskas asked if "one of [them wanted] to be part of the conversation" with Defendant and invited the officers into Defendant's room. Police presence in Defendant's room at that time was not required for any reason, medical or otherwise. The officers accepted Dr. Vaskas's invitation.

{37} It was just after 2:41 a.m. when the two uniformed, armed police officers entered Defendant's room with Dr. Vaskas and the charge nurse. The police officers and charge nurse blocked the doorway while Dr. Vaskas went to Defendant's bedside and immediately confronted Defendant with the statement: "We discovered

a dead baby in the bathroom." Defendant answered, "I'm sorry, it came out of me; I didn't know what to do."

{38}    We now proceed to determine whether the second and third requirements for a valid waiver of the physician-patient privilege were satisfied.

{39}    We first consider whether the Defendant had the mental and physical capacity to waive the privilege. In this instance, there is a serious question whether Defendant had the mental and physical capacity to waive the privilege. She was experiencing excruciating back pain. Shortly after midnight, she received powerful pain medication, a muscle relaxant, and morphine. Even after medical staff learned Defendant was pregnant, they continued those medications and stopped only when she said she urgently needed a bowel movement. Although the amount of morphine she received is unknown, it was sufficient to cross the placental barrier: the autopsy showed morphine in the infant's heart blood. Defendant also lost a significant amount of blood, expelled multiple large clots, and had a "wide open cervix." Dr. Vaskas concluded that she could die from a postpartum hemorrhage. Under all the circumstances, giving birth alone in the locked bathroom was surely shocking, frightening, and stressful to Defendant. This was Defendant's condition when Defendant's doctor, the charge nurse, and two armed, uniformed police officers confronted her at 2:41 a.m. We would ordinarily remand for an evidentiary hearing

on this question of capacity to waive. *See Lucero*, 2023-NMCA-035, ¶¶ 29-30. However, we do not do so here because the facts unequivocally demonstrate that due to Defendant's medical condition, she lacked capacity to waive her physician-patient privilege.

{40} And given the absence of capacity to waive and the circumstances surrounding her disclosure, the third prong of the test also supports Defendant's claim that her physician-patient privilege remains intact. Indeed, the totality of the circumstances indicate that any waiver by Defendant was not voluntary. In the hours before, Defendant presented at the emergency room in excruciating pain, was administered numerous medications, including narcotics, at unknown doses, she gave birth, and she suffered ongoing life-threatening blood loss. Despite her unresolved medical crisis, Dr. Vaskas, without authorization, ambushed Defendant, bringing with her two-armed officers who stood in the doorway of her hospital room, and disclosed her personal medical information to all persons in the room without warning. Defendant was not given the opportunity to exclude anyone from the room before Dr. Vaskas discussed her condition in the presence of others. Considering this sudden unauthorized disclosure, coupled with Defendant's compromised medical condition, under the totality of the circumstances, we cannot conclude that Defendant's waiver of her physician-patient privilege was voluntary.

**III.    CONCLUSION**

{41}    We affirm the order of the district court suppressing all evidence obtained by the State in violation of the physician-patient privilege.

{42}    **IT IS SO ORDERED.**

 

_____

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**JULIE J. VARGAS, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**DAVID K. THOMSON, Justice**

_____

**BRIANA H. ZAMORA, Justice**